SAMUEL GALEWITZ AND MARIAN GALEWITZ, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1078–66.    Filed April 17, 1968.

*Murray Kurman*, for the petitioners.
*Agatha Vorsanger*, for the respondent.

OPINION

HARRON, *Judge:* The Commissioner determined a deficiency in income tax for 1961 in the amount of $7,466.70. He disallowed a deduction of legal fees in the amount of $11,568.95.

The question is whether expenditures for legal fees paid in 1961 by Samuel Galewitz, hereinafter called the petitioner, or Samuel, in the amount of $11,568.95, for legal services in the defense of litigation instituted against the petitioner and others constitute ordinary and necessary expenses "for the management, conservation, or maintenance of property held for the production of income," within the provisions of section 212(2), 1954 Code; or are capital expenditures incurred to defend title to and ownership of shares of stock of the Walter Peek Paper Corp. and, therefore, are nondeductible expenditures.

The petitioners, residents of New Rochelle, N.Y., filed their joint return for 1961 with the district director of internal revenue for the Manhattan District of New York City.

All of the facts have been stipulated. The stipulated facts are so found and are incorporated herein by reference. Also incorporated herein by reference are the following: (1) The complaint in the lawsuit filed by Hannah Galewitz against Samuel Galewitz, Walter Peek Paper Corp., and others in the Supreme Court of the State of New York, County of New York. (2) The answer to the complaint filed in the same court by the defendants. (3) The opinion of the New York County Supreme Court denying on September 29, 1955, the defendants' motion to dismiss the complaint and for summary judgment, *Galewitz* v. *Walter Peek Paper Corporation*, 145 N.Y.S. 2d. 402 (1955), affd. 161 N.Y.S. 2d. 566 (1957). (4) The opinion of the New York County Supreme Court in *Galewitz* v. *Walter Peek Paper Corporation*, 182 N.Y.S. 2d. 750 (1958), affd. 191 N.Y.S. 2d. 359 (1959), by which the lawsuit was decided against Hannah, and her suit was dismissed.

The facts are as follows: Jacob Galewitz, the father of Samuel Galewitz, died testate on October 10, 1950. Samuel is one of the executors named in Jacob's will dated March 22, 1950. Jacob was survived by Hannah Galewitz, his second wife, and six children; two are children of Jacob and Hannah, and four are children of Jacob and his first wife. Samuel and Elsie Galewitz Schreiber are children of Jacob and his first wife. Hannah and Jacob were married on November 30, 1931.

In his will, Jacob provided that Hannah was to receive $2,500 cash, and in addition, the income for her life of one-third of his estate. The principal of Jacob's estate was to be divided equally among his six children. All of the children were adults. The gross estate was about $1,200,000, and the net estate was estimated as about $716,000.

There is no problem here about the payment of the cash bequest to the widow.

After the executors were appointed by the Surrogate's Court on February 26, 1951, Hannah filed a lawsuit in August 1954 against the Manhattan Co. and Samuel, the executors of the estate, and against Samuel and Elsie G. Schreiber, individually, and Walter Peek Paper Corp., by which she tried to have set aside, "as illusory and fraudulent, the transfer or issuance of 9 out of 10 shares" of the outstanding stock of Walter Peek Paper Corporation (hereinafter called Peek Corporation), which shares had been issued by the corporation in 1938, five shares to Samuel and four shares to Elsie. The remaining one share had been issued to Jacob and was part of the assets of his estate.

Samuel paid the legal fees in issue in 1961 to his attorneys, Vaughan & Lyons, for their legal services to him in his defense in that lawsuit, in his individual capacity.

The facts about Peek Corporation which have been stipulated, admitted in the pleadings, and found by the Supreme Court for New York County in *Galewitz* v. *Walter Peek Paper Corporation*, 182 N.Y.S. 2d. 750, are as follows: At some time before he married Hannah on November 30, 1931, Jacob organized the Peek Corporation under the laws of New York for the purpose of conducting a business of selling paper made for another corporation controlled by Jacob, the Clinton Paper Co. It was Jacob's intention that the earnings of Peek Corporation would provide income for Hannah, a few of her friends, and her then husband whom she was to divorce. Peek Corporation was in serious financial difficulties in 1933 and was indebted to Clinton Paper Corp. Full control of Peek was given to Jacob under an agreement dated February 14, 1933. Peek ceased all operations in the paper business in 1935. On July 1, 1935, it had no assets, and liabilities of over $1,700. When it was in difficulties in 1933, all its affairs were liquidated and all original outstanding shares were turned in as worthless by the stockholders. As of July 1, 1936, and for 1937, Peek's income tax returns showed no income and no assets. The tax return for 1938 showed that the business of Peek Corporation had been changed to a realty holding corporation, and that Jacob was its president. Minutes of the corporation dated February 25, 1938, show the election of Jacob, Samuel, and Elsie as directors and officers; Samuel was the chairman and Jacob was the treasurer. The 1938 tax return of Peek Corporation also shows that 10 shares were outstanding and were held 1 by Jacob, 5 by Samuel, and 4 by Elsie. Samuel was an officer and director of Peek at all times after 1938 and was active in the management of the corporation, which eventually became the owner of substantial real estate properties.

Only 10 shares of stock of Peek were outstanding in 1938 and thereafter. It is stipulated that Jacob, Samuel, and Elsie, individually, fully paid the corporation for his and her shares; and that the corporation issued the shares to each of them. Those shares were issued on February 25, 1938.

In its findings, the New York County Supreme Court in the suit of Hannah Galewitz found that there was nothing of an "illusory" nature in the operations of the Peek Corporation in 1938 and thereafter.

From the time Samuel acquired his five shares in 1938 until Jacob died in 1950, Samuel received $11,250 dividends on his five shares, and he included them in his tax returns.

In her lawsuit, Hannah did not claim that the nine shares held by Samuel and Elsie belonged to her. Rather, she sought to recapture the nine shares for Jacob's estate. The nine shares had not been issued first to Jacob and then transferred by him to Samuel and Elsie; the corporation had issued them directly to Samuel and Elsie. That issuance of the nine shares by the Peek Corporation was what Hannah sought to have set aside in her lawsuit. Also, she petitioned for the appointment of a receiver. But a receiver was never appointed.

Samuel and the other defendants, including the Peek Corporation, did not institute a lawsuit against Hannah. But they filed a motion to dismiss her suit on the ground that it did not state a good cause of action, and for summary judgment. Their motion was denied, and the case was tried. On appeal, that ruling was affirmed in 1957. But after trial, the court dismissed the complaint under a written opinion.

In her complaint, Hannah alleged *inter alia* that the issuance of the nine shares to Samuel and Elsie "constituted a fraudulent and illusory transfer of the assets of the said Jacob P. Galewitz, deceased."

As a preliminary step, Hannah sought to exercise an election to inherit from Jacob, as in a case of intestacy, under section 18 of the New York Decedent Estate Law; but the surrogate denied her such right of election, and his ruling was sustained on appeal. *In re Galewitz' Estate*, 148 N.Y.S. 2d. 823, affd. 163 N.Y.S. 2d. 937, and 177 N.Y.S. 2d. 710.

In view of their being named defendants in Hannah's suit, the executors of Jacob's estate filed a protective petition for affirmative relief, in which they asked that in the event the court should hold that the estate was the owner of the nine shares, then Samuel and Elsie should be required to deliver them to the executors and to account for all of the profits collected from them.

Hannah's suit went to trial. On November 26, 1958, the New York County Supreme Court, under a written opinion and findings, dis-

missed the complaint. In its opinion, the court stated, *inter alia*, the following: That the action by Hannah was to set aside, as illusory and fraudulent (i.e., not real), the transfer or issuance of nine out of 10 outstanding shares of the Peek Corporation to Samuel and Elsie, children of her deceased husband; that the nine shares had been issued directly by the corporation on February 25, 1938; that it was the issuance of this stock which the plaintiff sought to set aside; and that the executors properly were named as defendants since a recovery by the plaintiff would be equivalent to finding that the decedent, Jacob, was the owner at death of the nine shares issued in 1938 to Samuel and Elsie.

The court stated and concluded that on issues pertinent to the business or transactions of the Peek Corporation, Hannah's testimony was hardly credible; and that her testimony about payment for the stock originally issued, "and her reimbursement to the original shareholders" was "without support other than her own word, is [was] utterly incredible and was in fact undermined by her own testimony." The court set forth the facts about the financial difficulties of the corporation in 1933; about the liquidation of its affairs, and the turning in of the original shares, as worthless, by the shareholders; and about the issuance of the new shares by the corporation on February 25, 1938. (All of those facts have been set forth hereinabove.) The court reviewed the facts about what was shown in the tax returns of the corporation for the taxable periods 1935, 1936, 1937, and 1938; and about the records and minutes of the corporation, and concluded that "nothing of an 'illusory' character is anywhere observed in this operation." (p. 753) The court found that "There had been no change in any of the wills [of Jacob] in the matter of the Peek Corporation shares and the holding by the deceased of but one of the ten outstanding shares. * * * There was nothing of an 'illusory nature' in the ownership by defendants Samuel and Elsie of the nine shares of the Peek Corporation issued to them in 1938. Any claim of plaintiff herself, or on behalf of the estate by her, to said shares is wholly without credible support in the record." The court concluded its opinion as follows:

On the other hand, deceased had on a number of occasions acted in relation to the Peek corporation affairs and the respective interests of his son and daughter therein from February, 1938 on. Deceased signed the minutes of the Peek corporation of February 25, 1938; he signed the stock certificates here challenged; he signed the franchise tax returns recording the ownership of the shares; he made declarations on the returns of the Clinton Paper Corporation and to his counsel—all bearing on the reality and good faith of the Peek corporate stock ownership. All this, combined with the active operation of the business by his son, Samuel, both of Peek and Clinton—*these furnish indisputable proof of the unassailability of the transaction under attack.* Let judgment be entered dismissing the complaint but without costs. [Italics added.]

The foregoing facts are the substantial facts about the lawsuit of Hannah. Her complaint was dismissed. The court did *not* find any merit in her claim that the corporation's issuance of the nine shares in 1938 to Samuel and Elsie was not real and was "illusory and fraudulent"; and the court held that the issuance of five shares to Samuel and four shares to Elsie could *not* be set aside as illusory and fraudulent as to Hannah or to Jacob's estate.

Other facts are: Since the end of the litigation, Peek Corporation has paid, regularly, substantial dividends. In 1961, Samuel received on his five shares dividends in the amount of $10,500.

We turn now to discussion of the issue and our decision thereof. As stated at the outset, the question arises under section 212(2), and is whether Samuel's legal expense of $11,568.95, in his own defense in the litigation instituted by Hannah, is deductible as nonbusiness expense in conserving and maintaining property held for the production of income.

Petitioner contends that Hannah did not seek to obtain a determination that the nine shares should be transferred to herself, but, rather, she attempted to have the transfer of the shares to Samuel and Elsie set aside, and to have a determination made that Jacob owned the shares at the time of his death, and therefore they should be transferred to the executors of his estate as property of the estate. That contention of the petitioner is correct.

Petitioner contends, further, that the primary objective of Hannah's suit was to augment and increase her share of the income of the estate, and to obtain an accounting of the profits or earnings of the nine shares. We believe that this contention is basically correct.

The facts found by the New York County Supreme Court are to the effect that in 1938 Peek Corporation became a real estate holding corporation. The evidence in this case is to the effect that in the period 1938 until Jacob's death in October 1950, Peek's real estate business was quite profitable and it paid substantial dividends. That is to say, the shares of stock of Peek Corporation were income-producing property. Hannah's interest in Jacob's estate was limited to a life interest in the income of one-third of his estate, and if it had been determined, as the result of Hannah's suit, that the nine shares had belonged, in reality, to Jacob, and hence to his estate upon his death, the amount of the income of the estate would have been increased substantially, and so would her share of that income.

Petitioner contends, also, that Hannah's suit, to have a determination made that the issuance by Peek of the nine shares to Samuel and Elsie was "illusory and fraudulent," and therefore should be set aside, was without merit and was ill-founded. We agree with that contention for the following reasons: The respondent has agreed and

stipulated in this case that each of the individuals to whom Peek Corporation issued the new stock in 1938, i.e., Jacob, Samuel, and Elsie, made full payment to the corporation, individually, for those shares. Furthermore, the New York County Supreme Court, upon trial of Hannah's claims, found and held that there was nothing "illusory" in the whole operation involving the issuance by the corporation of the new stock in 1938, and the conduct of its business thereafter by Jacob and Samuel, as officers and directors; that the corporate transactions had been satisfactorily accounted for; and that Hannah's claims were no more than "a weak attempt" to explain away those satisfactorily explained transactions, and that all of the evidence furnished "undisputable proof of the unassailability of the transaction under attack," namely the issuance of the nine shares to Samuel and Elsie. The court characterized Hannah's testimony as "hardly credible" (about some of her allegations), and as "utterly incredible" (in other instances).

Upon all of the evidence here, we must find and conclude, and we do, that Hannah's claims and lawsuit were wholly without merit and were completely unfounded.

It is true that in suing to set aside the corporation's issuance on February 25, 1938, of five shares to Samuel and four shares to Elsie, Hannah attacked the validity of the title to and ownership of those shares by Samuel and Elsie, respectively; and she put each of them to the effort and expense of defending his and her ownership of the shares. The right of Samuel and Elsie, respectively, to keep the shares was in issue in the litigation. Referring now simply to the petitioner, in this case, Samuel was obliged to defend his title to five shares.

The narrow question in this case is whether having had to defend his title to the five shares, under all of the circumstances, and in defense against claims that were lacking in merit or substance, the legal expense must be capitalized as a capital cost, or can be deducted as a non-business expense.

For the petitioner it must be said that he had owned and held the five shares for 16½ years prior to Hannah's suit, and during that period of time, he had received $11,250 in dividends. The shares constituted income-producing property.

It was said in *Sergievsky* v. *McNamara*, 135 F. Supp. 233, 236 (S.D. N.Y. 1955) :

Viewed realistically, plaintiff's defense of the Turner action and her personal payment of her share of the legal expenses incident to the defense of that lawsuit, represented action to preserve income-producing property that she owned personally.[2]

\* \* \* \* \* \* \*

In general, the cost of the legal defense of title to property is a capital expenditure.[3] In the category of capital expenses are legal fees paid to quiet or perfect title to land,[9] to defend an action to invalidate a sale of stock,[10] and to defend

a statutory proceeding for the perpetuation of testimony with regard to a claim for property.[11]

However, the "line of demarcation between an 'ordinary and necessary expense' as a deductible item and an expenditure incurred in defense of title to property and therefore not deductible is extremely narrow. In fact, in some of the cases it appears to have been drawn on an arbitrary rather than on a basis of reason or logic."[12] * * * [Quotation from *Rassenfoss* v. *Commissioner*, 158 F. 2d 764, 766.]

[Footnotes omitted.]

See also *Hochschild* v. *Commissioner*, 161 F. 2d 817 (C.A. 2, 1947) ; and *Willy Zietz*, 34 T.C. 369 (1960).

In each of the three cases cited above, the taxpayer paid legal fees for the successful defense of an action challenging his rightful ownership of dividend-paying securities, such challenging action having been judicially determined to be "ill-founded," or "wholly without merit," or an "abortive attack."

The taxpayer in each of the *Sergievsky* and *Hochschild* cases, respectively, was a successful defendant in another stockholder's derivative lawsuit, whereby the taxpayer-defendant's ownership of certain shares of stock of a corporation was challenged, and the person bringing the lawsuit sought to have the court order that the shares in question should be transferred back to the corporation by the taxpayer-defendant, or that the taxpayer-defendant should be required to account for the value of the shares, if the shares previously had been sold. In the *Hochschild* case, the taxpayer was allowed deduction of his legal expense in his defense, as an ordinary and necessary business expense. In the *Sergievsky* case, the taxpayer was allowed a deduction of his legal expense in his defense, as an ordinary and necessary nonbusiness expense. The court, in the *Hochschild* case stressed the point that the necessary legal expense "fended off an abortive attack." In the *Sergievsky* case, the trial court stressed the point that the defensive legal expense was incurred in "beating off an ill-founded suit."

In the *Zietz* case, the facts were similar to those presented in the instant case. Willy Zietz incurred and paid legal fees totaling $9,977, for services of several lawyers, in two types of litigation, as is explained in the findings and opinion in *Willy Zietz, supra* at 369–372. The first type of litigation involved the taxpayer's efforts to have the value of his own assets excluded from the alleged value of his deceased mother's separate estate; taxing authorities claimed that properties owned by Willy Zietz were part of his mother's estate. We held (p. 385) that the legal fees of $3,647, incurred in those matters, were incurred and paid in order to conserve and maintain Willy's own income-producing property and, therefore, were deductible. The second group of legal fees, $6,330, incurred in another kind of defensive litigation, were held to be deductible because they, too, were incurred in conserving and maintaining income-producing property owned by the taxpayer, under the

following circumstances: The taxpayer, Willy Zietz, was successful after lengthy litigation in local Swiss courts in obtaining the dismissal of the claims of the divorced wife, Madeleine, of his deceased brother, Hugo, Jr., who was endeavoring to take away from Willy assets derived from his father's estate. She claimed that her divorce from Hugo, Jr., was illegal, and that she was entitled, as his so-called "widow," to the one-half share of the assets of their father's estate which had passed to Willy Zietz, as the sole "reversionary" survivor under German law (after the death of their mother and the brother) under the will of their father. The mother, of Willy and the deceased brother, was the "provisional" heir under German law of her deceased husband's estate for life. The two sons, or the survivor, were the final, or "reversionary heirs" (under German law), after the death of their mother. This Court stated in *Willy Zietz, supra* at 382, 383:

The situation here is one which requires practical application of the tax statute in an unusual setting. In the first place, it was judicially determined by several Swiss courts that the claims of Madeleine were wholly without merit and malicious. Madeleine had no valid basis for seeking to obtain any of the assets which had passed to the petitioner under his father's will upon the death of his mother. That was her purpose. * * *

It would be inaccurate and unrealistic to say that Madeleine's suits were bona fide attacks on petitioner's title to the property which he had inherited from his father. * * *

\*         \*         \*         \*         \*         \*         \*

Our conclusion here is that petitioner's purpose in incurring the legal fees paid to resist Vogt's efforts to attach and tie up some of his securities, which he owned as part of the remainder of the assets of his father's estate, was not to perfect his title to the securities but was to maintain and conserve his income-producing property. The legal expense bore a reasonable and proximate relation to the conservation of property held for the production of income. Cf. *Bingham's Trust* v. *Commissioner, supra.* It is held that the legal fees amounting to $6,330 fall within the scope and meaning of section 23(a) (2) and are deductible as ordinary and necessary nonbusiness expense.

The reasoning in each of the cases, *Willy Zietz, supra, Sergievsky,* and *Hochschild,* applies here. See, also, *Trust of Bingham* v. *Commissioner,* 325 U.S. 365; *Frederick E. Rowe,* 24 T.C. 382; and *Allen* v. *Selig,* 200 F. 2d 487, affirming 104 F. Supp. 390.

It is held that petitioner's purpose in incurring the legal fees in issue to resist Hannah's groundless efforts to obtain a transfer of his five shares of Peek stock to the executors of the estate of his father, Jacob Galewitz, deceased, was not to perfect Samuel's title to the shares, but was to maintain and conserve his income-producing property, and was to fend off an attack which was not bona fide. The legal expense bore a reasonable and proximate relation to the conservation of property (shares of stock) held for the production of income; and the legal fee of $11,568.95 comes within the scope and meaning of section 212(2), 1954 Code, and is deductible.

Careful consideration has been given to the respondent's argument and the cases on which he relies. He relies largely on *Morgan's Estate* v. *Commissioner*, 332 F. 2d 144, affirming and reversing in part 37 T.C. 31, on the apportionment of expenses between defense of title and protection of income from the property. The conclusion here is in harmony with the guidelines set forth in the *Morgan* case. This case is distinguishable on its facts from *Morgan Jones Estate*, 43 B.T.A. 691, affd. 127 F. 2d 231; *Addison* v. *Commissioner*, 177 F. 2d 521, 523; and *E. W. Brown, Jr.*, 19 T.C. 87, affd. 215 F. 2d 697.

*Decision will be entered for the petitioners.*