Harry H. Goldberg v. Commissioner. Harry H. Goldberg and Eve Goldberg v. Commissioner.
Goldberg v. Commissioner
Docket Nos. 4199-67, 4200-67.
United States Tax Court
T.C. Memo 1970-27; 1970 Tax Ct. Memo LEXIS 330; 29 T.C.M. (CCH) 74; T.C.M. (RIA) 70027; February 4, 1970. Filed *330 [Joint returns: Requirements: Signature of both spouses.] Held: 1. The income tax return filed by petitioner, Harry H. Goldberg, for the taxable year 1962, and signed by him alone, was not intended by his spouse to be a joint return, and, accordingly, the tax could not properly be computed at joint return rates. [Code Sec. 212(2)] [Legal fees: Property settlement: Relation of action to business property.] 2. Attorney fees paid in 1964 by petitioner primarily in connection with the negotiations and court proceedings surrounding a property settlement with his wife were not deductible under section 212(2) as an ordinary and necessary expense paid for the conservation or maintenance of property held for the production of income. [Code Sec. 165(g)] [Losses: Worthless securities: Wholly worthless.] 3. The debenture bond purchased in 1961 by petitioner became wholly worthless in 1962 so as to entitle him to claim a capital loss for that year under section 165(g). Gene W. Reardon and Julie M. Reardon, 2150 First National Bank Bldg. , Denver, Colo., for the petitioners. Frederick B. Strothman, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined *331 deficiencies in the Federal income taxes of petitioner as follows: Docket No.
Petitioner
Year
Amount
4199-67
Harry H. Goldberg
1962
$15,903.59
1963
2,346.42
1964
3,118.94
4200-67
Harry H. Goldberg and Eve Goldberg
1965
4,418.45
Petitioner Harry Goldberg, aside from disputing the above determined deficiencies, claims a refund for 1964 with regard to certain attorney fees which were not claimed as a deduction on his tax return for that year. 75 The issues presented for our decision in these consolidated cases are: (1) Whether the income tax return filed for the year 1962 in the names of "Harry H. and Rosamond Goldberg," but signed only by Harry Goldberg, was a joint return of both taxpayers for that year. (2) Whether certain legal fees paid by Harry Goldberg primarily in connection with the negotiations and court proceedings surrounding a property settlement with his wife were deductible for the taxable year 1964 under section 212(2). [1]
(3) Whether a debenture bond purchased in 1961 by Harry Goldberg in the Clute Corporation became wholly worthless in 1962 so as to entitle him to claim a capital loss for that *332 year under section 165(g). General Findings of Fact Some of the facts and exhibits have been stipulated and are incorporated herein by this reference. Petitioner Harry Goldberg, Docket No. 4199-67, resided in Denver, Colorado at the time the petition herein was filed. He filed his Federal income tax returns for the taxable years 1962, 1963 and 1964 with the district director of internal revenue for the district of Colorado, Denver, Colorado. Petitioners Harry Goldberg (hereinafter referred to as "Harry" or "petitioner") and Eve Goldberg, Docket No. 4200-67, are husband and wife, and resided in Denver, Colorado at the time the petition herein was filed. They filed their joint Federal income tax return for the taxable year 1965 with the district director of internal revenue for the district of Colorado, Denver, Colorado. Eve Goldberg is a party to this case solely by virtue of having filed a joint return for the year 1965 with her husband Harry, and the designation of "petitioner" will hereinafter refer only to Harry. Joint Income Tax Return and Attorney Fees Issues Findings of Fact Harry and Rosamond Goldberg (hereinafter referred to as "Rosamond") were married on October 30, 1945. *333 They lived together as husband and wife until April 29, 1962, at which time they separated. Rosamond was under the belief at that time that Hary was involved in an extramarital affair with another woman. On October 16, 1962, Rosamond filed a complaint in the District Court in and for the City and County of Denver, State of Colorado (hereinafter referred to as the "Denver District Court"), Civil Action No. B-57646, wherein she sought a decree of absolute divorce, temporary allowance of alimony, attorney fees, adequate support money pending the determination of the action, and for a property settlement allowing her one-half of the property of which Harry was possessed. The complaint alleged, inter alia, that Harry had been guilty of extreme and repeated acts of mental cruelty, which consisted of an abandonment of any interest in Rosamond and open and notorious violation of his marriage vows to her. On December 21, 1962, Rosamond amended the complaint to seek a decree of separate maintenance instead of an absolute divorce. The amended complaint, except for its plea for separate maintenance, was exactly the same in its allegations and relief sought as the original October 16, 1962 complaint. *334 In early 1963, prior to April 15, an income tax return for the taxable year 1962, employing joint return rates and headed "Harry H. and Rosamond Goldberg" was prepared by an accountant, who had for many years been the preparer of the joint income tax returns of Harry and Rosamond Goldberg. He did not consult with Rosamond regarding any aspects of the 1962 return and did not ask her to sign the return because he felt she would refuse to do so. Asking her to sign the return, he thought, would only have resulted in a violent outburst on her part. Harry also refrained from asking Rosamond to sign the return. Rosamond never authorized Harry, the accountant, or anyone else to file a joint tax return for 1962 on her behalf. The 1962 return, as filed, was signed only by Harry. Rosamond did not file a separate income tax return for 1962. She did not receive any income in that taxable year. On June 24, 1963, a Decree of Separate Maintenance was granted to Rosamond upon the statutory grounds of extreme and repeated acts of cruelty. The decree further ordered that a hearing be set for 76 September 24, 1963, with regard to the division of property, maintenance, costs and attorney fees. As to the *335 property division issue, Rosamond and her attorney took the position that because of the length of the marriage she should be entitled to one-half of the net assets in Harry's name. Pursuant to an order of the Denver District Court, an affidavit together with the financial statement schedules of Harry's assets and liabilities was filed with regard to the property division issue. Part of the assets owned by Harry, to which Rosamond's claim would obviously apply, was the capital stock of Colorado Metal Products Co., a subchapter S corporation. A substantial amount of Harry's income during the taxable years 1962 and 1963 was derived from his salary and dividend income, actual and constructive, from the Colorado Metal Products Co. Harry was especially contesting Rosamond's claim to one-half of the capital stock of Colorado Metal Products Co. because he feared that her ownership and exercise of a substantial management interest would lead to the failure of such corporation. On July 7, 1964, an order was entered by the Denver District Court denying Harry's motion to leave the property undivided. The court held, essentially, that the current Colorado law on separate maintenance, just as it *336 was with respect to divorce, allowed for a division of property upon the application of either party. On October 16, 1964, Findings of Fact, Conclusions of Law, Opinion, and Decree were entered by the Denver District Court which provided, in pertinent part, as follows: Several hearings have been held in the case to settle the property rights and alimony rights of plaintiff [Rosamond]. * * * Defendant has challenged the jurisdiction of the Court to make a property settlement award in a separate maintenance action, and the Court ruled July 7, 1964, that within its discretion, the Court may make a final settlement of the parties' property rights in this case. Accordingly, it is the Court's intent that this decree shall forever settle the rights of inheritance and property rights of the parties and the right of plaintiff to receive alimony from defendant. * * * The Court is cognizant of its inability to require the payment of alimony beyond the death of the parties, * * * but plaintiff's best interests and the tax complications require the payment of alimony for a term certain. It is in the interest of both parties that the matter be resolved in this fashion and that the obligation of *337 defendant be contractual in nature, because such contractual obligations survive the death of the parties. * * * Accordingly, this decree is [conditional] upon defendant's written acceptance of it as a contractual obligation to plaintiff, her heirs, executors, administrators and assigns, and binding upon him, his heirs, executors, administrators and assigns. Upon defendant's written acceptance of this decree as a contractual obligation, and when the decree becomes final, the decree shall have the full force and effect of a contract. * * * THE COURT FINDS: * * * 9. The defendant has admitted acts of gross marital misconduct which have already brought disgrace and public disapproval upon him. As a matter of fact, a civil action and a criminal action were filed as a result of the adulterous conduct of the defendant. The depositions on file reveal the details of his misconduct, and his admissions have been fully considered by the Court in arriving at this property settlement and decree. * * * IT IS ORDERED, ADJUDGED AND DECREED: A. Plaintiff shall retain the personalty mentioned in paragraph 3 of the Findings of Fact, and in addition will be awarded the family home, worth $78,000.00. B. *338 Defendant shall pay to plaintiff $300,000.00 as property settlement in installments as follows: (a) $100,000.00 within 30 days, and $100,000.00 within 90 days after this decree becomes final, and the final $100,000.00 within 180 days after the decree becomes final. C. Defendant, his heirs, executors, administrators and assigns shall pay to plaintiff, her heirs, executors, administrators and assigns alimony in the amount of $2,000.00 per month, commencing December 1, 1964, and continuing for a period of 121 months through January 1, 1975. During November, 1964, the prior order of $2,300.00 per month shall remain in effect. D. Commencing February 1, 1975, while both plaintiff and defendant are living, and so long as plaintiff is not married to a person other than defendant, 77 defendant shall pay to plaintiff alimony in the amount of $1,000.00 per month, * * * H. Defendant has heretofore been ordered to pay and has paid appraisal fees and deposition expenses in the amount of approximately $10,000.00. Additionally, defendant has heretofore paid Charles Ginsberg, one of plaintiff's attorneys, $9,938.63, of which $9,000.00 was paid as an attorney's fee and $938.63 was paid for his travel *339 expense and the expense of depositions taken in Palm Springs, California. The payments to be made to plaintiff should be net to her. It is ordered that defendant pay all attorneys' fees, and, the Court having heard testimony as to the reasonable value of the services of counsel, the following attorneys' fees are found to be reasonable and defendant is ordered to pay them: Charles Ginsberg
$31,000.00
Anthony F. Zarlengo As Attorneys for Plaintiff
$10,000.00
Sydney H. Grossman and Fred M. Winner As Attorneys for Defendant
$36,000.00 * * *
On October 30, 1964, Harry filed a document with the Denver District Court accepting the decree of October 16, 1964 as a contractual obligation. On December 1, 1964, an order clarifying the decree of October 16, 1964 and overruling Harry's motions for a new trial and modified findings of fact and conclusions of law was made by the Denver District Court. The order incorporated an agreement by Rosamond where she waived all rights to appeal the decree and accepted it as a final adjudication of her rights to seek alimony and a property settlement from Harry and as a final and complete settlement of all her property rights against Harry, his estate, his heirs, *340 executors or administrators. On December 1, 1964, certain payments, via checks drawn on the Colorado Metal Product Company's bank account and charged to Harry's account on the corporation's books, were made to the attorneys representing both Harry and Rosamond in the litigation proceedings. The amounts paid to the attorneys for their legal services on this date, totaling $54,500, were all paid pursuant to the Denver District Court's orders. Payments of $24,000 had previously been made to the attorneys, but the record does not disclose at what specific times these payments were made. These fees were not claimed as deductions on petitioner's 1964 income tax return. The time spent by all these attorneys during this litigation was devoted primarily to effecting the property division and alimony settlement between Harry and Rosamond. On April 5, 1965, Harry filed a complaint for divorce against Rosamond in the Eighth Judicial District Court of the State of Nevada in and for the County of Clark. Subsequently in 1965, Harry and Eve Goldberg were married. In March, 1966, Harry executed a Form 872, "Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax," extending the *341 statute of limitations for the taxable years 1962 to June 30, 1967. Rosamond also, during March, 1966, executed a Form 872 extending the statute of limitations for the taxable years 1962 to June 30, 1967. With certain blank spaces typed in, the top part of both of these forms read, in pertinent part, as follows: Pursuant to existing Internal Revenue Laws, Harry H. and Rosamond Goldberg, a taxpayer (or taxpayers), * * * and the District Director of Internal Revenue hereby consent and agree as follows: *** These forms were not jointly signed; as mentioned above, one form was signed by Harry and the other by Rosamond. In February, 1967, Harry executed an other Form 872 with respect to the taxable year 1962, extending the statute of limitations to June 30, 1968. In this particular form, Harry was listed as the taxpayer who consented to an extension of the statute of limitations with respect to the taxable year 1962. The record does not disclose whether or not Rosamond was requested to execute or in fact did execute any other Form 872 "Consent" with respect to the taxable year 1962. In February, 1967, Harry also executed a Form 872 with respect to the taxable year 1963, extending the statute *342 of limitations to June 30, 1968. In his notice of deficiency to petitioner with respect to the taxable year 1962, respondent determined that the income tax return for such year was filed as a separate return and that the tax would accordingly be computed at rates applicable to married persons filing a separate return rather than at rates applicable to married persons filing a joint return. In his petition requesting a redetermination of the income tax deficiencies set forth in 78 respondent's notice of deficiency regarding the taxable years 1962, 1963 and 1964, petitioner alleged, inter alia, that he was entitled to an income tax deduction for attorney fees paid in 1964 in the aggregate amount of $77,000. In his answer to the petition, respondent denied, inter alia, petitioner's allegation with respect to the deductibility of the 1964 attorney fees. Ultimate Finding of Fact Rosamond did not intend the 1962 return to be treated as a joint return by her and petitioner. Clute Bond Issue Findings of Fact On January 5, 1961, petitioner purchased a 7-percent debenture bond in the amount of $25,000 from the Clute Corporation. On November 5, 1962, the Clute Corporation filed a Petition for *343 Reorganization pursuant to Chapter X of the Bankruptcy Act in the United States District Court for the District of Colorado, No. 32895. The Petition for Reorganization alleged, in pertinent part, as follows: Your petitioner, The Clute Corporation, respectfully represents; 1. Your petitioner is unable to pay its debts as they mature. * * * 7. There are presently pending against your petitioner numerous proceedings which may affect the property of your petitioner. These proceedings, insofar as is presently known to the present management of your petitioner, all involve claims for non-payment for goods, materials or services had and received and for notes and debentures unpaid or otherwise in default. * * * 8. No plan of reorganization, readjustment or liquidation affecting the property of your petitioner is pending in any judicial proceeding, and none is pending outside of any judicial proceeding. 9. Your petitioner is entitled to relief under the provisions of Chapter X of the Bankruptcy Act for the following reasons: (a) Although your petitioner's assets are of substantial value, petitioner is presently unable to pay its creditors in full. A forced sale of said assets will result in *344 a diminution and loss of the value of the assets and consequent loss to creditors and others having claims against petitioner. (b) Numerous lawsuits against your petitioner have been commenced or threatened; some judgments have been obtained; and levy after judgment will give certain creditors an inequitable advantage over others. Sale of some of the assets by judgment creditors and others will scatter the assets, destroy the business and cause irreparable damage and loss to creditors and holders of the petitioner's securities. Only by preserving the estate intact can petitioner's businesses survive and creditors and others be adequately protected. A prompt reorganization will secure a greater return to creditors, lienors and other interested persons than will permitting the petitioner's businesses to distintegrate. (c) A substantial portion of the value of petitioner's assets consists of "going concern" value and good will which will be lost in the event of a shut-down of petitioner's businessses, which are presently deteriorating to petitioner's damage. Your petitioner is unable to pay fixed operating charges and other obligations as they mature, is unable to make improvements or *345 replacements, and the credit of its businesses is being steadily impaired. Only through a prompt and efficient reorganization under Chapter X can the business be rescued from threatened destruction and unnecessary loss avoided. * * * 13. No other petition by or against your petitioner is pending under Chapter X of said Act, nor is any other bankruptcy proceeding initiated by a petition by or against your petitioner now pending. A "Statement of Assets, Unrecovered Costs, Liabilities and Financial Condition" attached to the Petition for Reorganization contained the following information: 79 *10 THE CLUTE CORPORATION *10 STATEMENT OF ASSETS *10 UNRECOVERED COSTS, LIABILITIES *10 AND FINANCIAL CONDITION (NOTE 1)
October 15, 1962
Assets and Unrecovered Costs
Cash (Note 2)
$ 5,509.31
Accounts Receivable (Note 3)
141,325.99
Notes Receivable Paco Products, Inc. (Note 4)
13,000.00
Jaffin & Schneider (Note 5)
30,372.36
Prepaid Insurance (estimated)
5,000.00
Deposits (Note 6)
2,425.00
Property, Plant and Equipment (at cost) (Note 7) $23,217.04
Less: Accumulated Depreciation 7,403.05 15,813.99
Investments in and advances to Mica Division (Note 8)
525,892.02
Investments in and advances to Asbestos Bonding Corporation (Note 9)
1,286,562.12
Investments in and advances to Ajax Iron Works Company and Truco Division of Clute (Note 10)
352,910.67
Patents, less amortization of $59,399.57 (Note 11)
144,863.41
Organization Expense
199.45
Possible Claims Arising in Connection with Disposition of the Syn- koloid Company (Note 12)
Possible Claims Against Management Personnel (Note 13) $2,523,874.32
Liabilities
Claims, Notes, Judgments and Accounts Payable (Note 14)
$591,442.91
7% Series A Registered Debenture Notes (Principal and Accrued Interest) (Note 15)
542,292.00
7% Series B Registered Debenture Notes (Principal Only) (Note 15)
250,000.00
Accrued Interest on Series B Debenture Notes
15,312.50
Contingent Liabilities (Note 16)
$1,399,047.41
Shareholders' Equity, Based on Foregoing (Note 17) $1,124,826.91
*346 NOTES TO STATEMENT OF ASSETS, UNRECOVERED COSTS, LIABILITIES AND FINANCIAL CONDITION OF THE CLUTE CORPORATION (1) All the information in the Statement of Assets, Unrecovered Costs, Liabilities and Financial Condition of The Clute Corporation is presented only insofar as known to the present management of The Clute Corporation as of October 15, 1962. The present management personnel of The Clute Corporation have been actively engaged in its management only since approximately July 10, 1962. Although some of the present directors of The Clute Corporation also were its directors prior to the date specified above, they did not participate in the management of The Clute Corporation except for attendance at certain directors' meetings; and executive direction of the corporation, management of its day-to-day operations, custody and maintenance of its corporate and financial records and other matters were conducted prior to said date by persons other than present management personnel. Since assuming active management of the corporation, the present management has discovered that apparently pertinent financial records as to certain matters and transactions prior to the date specified above *347 either are not available or were not maintained on a current basis, or possibly are deficient or incorrect in material respects. For the above reasons, certain of the information reported herein has been based on estimates of the present management. Other information presented herein simply reflects entries presently appearing on such books and records of the corporation as are now available. Because of lack of time and management's opinion that the filing of the attached petition is a matter of urgency, no attempt has been made to audit or independently to verify any of the attached information. None of the amounts stated purport to represent realizable values, and no attempt has been made to assign values to any good will or to set forth any going concern value of any business in which The Clute Corporation has or may have an interest. All information presented should be considered as subject to completion or amendment after further investigation. * * * (3) Of the amount stated [$141,325.99 of Accounts Receivable], $19,323.61 80 reflects a balance as of December 31, 1961, in the corporation's general ledger showing accounts receivable in the amount of $19,323.61, and a balance of *348 $51,344.74 representing old accounts receivable of Truck Equipment Company. Management is presently unaware of the nature of such accounts receivable. The remaining accounts receivable stated ($70,657.64) represents accounts receivable acquired upon disposition of The Synkoloid Company (see Note (12) below). All or a substantial portion of said Synkoloid accounts receivable are believed uncollectible. (4) The note receivable from Paco Products, Inc. [in the amount of $13,000] arose from prior cash advances to Paco Products, Inc. In the opinion of the corporation's management, there is substantial risk that the note is uncollectible. * * * (8) Pursuant to a series of agreements with other persons, the first of which was entered into in 1958, The Clute Corporation constructed a mica mill and subsequently a fine grinding plant, both located in New Mexico. The fine grinding plant is presently in active operation. In the opinion of the corporation's management, such operations are being conducted at an operating profit. A summary of recent operating results of the fine grinding facility for the period April 23, 1962, to August 31, 1962, is attached hereto as Exhibit B. Although the Clute *349 Corporation presently claims full ownership of said mica mill and fine grinding plant (except that, in the event materials from certain specified mining properties are processed through use of such facilities, operating rights are vested in the persons for whom the mill and fine grinding plant originally were constructed), the corporation's ownership and rights to possession and operation thereof, and to the proceeds therefrom, are presently disputed. The Clute Corporation's investment in its mica division is summarized as follows: Advances to persons operating the facilities
$131,420.65
Plant equipment at construc- tion cost, less depreciation of $86,149.47
244,471.37
15% working interest in mining claims
* 150,000.00 $525,892.02 The present management is unable to state whether such valuation was justified. (9) Asbestos Bonding Corporation (ABC) is a California corporation, all the outstanding capital stock of which is owned by The Clute Corporation. ABC is engaged in mining, milling and *350 producing asbestos and asbestos products from properties situated in Napa County, California. The mineral properties are leased by The Clute Corporation from persons who are or were affiliated with The Clute Corporation. The results and operations of ABC are summarized in Exhibit C attached hereto for the period commencing May 1, 1962, and ending October 15, 1962, the only period as to which the present management of The Clute Corporation has available relatively reliable information. The Clute Corporation's investments in and advances to ABC are summarized on the available books and records of The Clute Corporation as follows: Portion of investment rep- resented by issuance of common stock of The Clute Corporation 105,000 shares at an assigned value of
$457,500.00
Additional investment and advances 829,062.12 $1,286,562.12 (10) In May 1960 The Clute Corporation acquired, in exchange for 15,225 shares of its common stock, all or substantially all of the assets and liabilities of Truck Equipment Company, a Colorado corporation which also has operated under the trade name of Truco, Inc. The assets of Truck Equipment Company included 7,098 shares of The Ajax Iron Works Company, also a Colorado *351 corporation which has operated under the trade name of Truco-Denver, Inc. The Ajax Iron Works Company subsequently purchased, using funds ($21,546) advanced by The Clute Corporation for that purpose, 1,512 shares of the common stock of The Ajax Iron Works Company from other persons; and The Clute Corporation then acquired 756 additional shares of stock of The Ajax Iron Works Company in exchange for 17,557 shares of the common stock of The Clute Corporation. The result of the foregoing transactions was that The Ajax Iron Works Company became a wholly-owned subsidiary of The Clute Corporation. The business of Truck Equipment Company thereafter was operated as a division of The Clute Corporation, and the corporate entity known as Truck Equipment Company has since been completely inactive. * * * 81 Of the total outstanding capital stock of The Ajax Iron Works Company owned by The Clute Corporation, 19,244 shares are pledged to secure a promissory note dated December 1, 1959, in the original principal amount of $94,048.00 payable to the order of William Burkart (now deceased) originally made by Truck Equipment Company prior to acquisition of its assets and business by The Clute Corporation. *352 The Clute Corporation assumed liability on said promissory note at the time it acquired the assets and business of Truck Equipment Company. The present business of The Ajax Iron Works Company (which now operates all or substantially all the assets and business formerly owned by The Ajax Iron Works Company and Truck Equipment Company) consists in general of design, fabrication and manufacture of trailers, truck bodies, earth moving machines, hydraulic truck mounted material and personnel handling equipment, derricks and hydraulic cylinders, and other items. Available books and records presently indicate that The Clute Corporation's investments in and advances to The Ajax Iron Works Company and Truco Division of The Clute Corporation aggregate approximately $352,910.67, including the above-mentioned 32,782 shares of common stock of The Clute Corporation issued upon acquisition of the subject assets and business, which shares are reflected on the books of The Clute Corporation at a recorded value of $327,820. The balance sheet of The Ajax Iron Works Company as of September 30, 1962, together with a statement of operations for The Ajax Iron Works Company for the nine months ended September *353 30, 1962, are attached hereto as Exhibit D. (11) Patents, patent applications and trademarks, aggregating $204,262.98, are being amortized over a ten-year period beginning July 1, 1960. Included therein are patents and applications acquired in 1957 in exchange for 300,000 shares of The Clute Corporation's common stock at an assigned value of $150,000.00. (12) In 1961 The Clute Corporation acquired The Synkoloid Company, a California corporation, in a corporate merger transaction in which the presently outstanding 16,950 shares of the preferred stock of The Clute Corporation were issued in exchange for then-outstanding shares of common stock of The Synkoloid Company. On or about July 10, 1962, all the capital stock of The Synkoloid Company owned by The Clute Corporation was sold to Baltimore Paint and Chemical Company. As a result of such sale, The Clute Corporation received cash and other assets having a purported value of approximately $330,000.00. Certain of the management personnel of The Clute Corporation and other persons have expressed the opinion that the sale of The Synkoloid Company was not accomplished pursuant to due authority of the stockholders of The Clute Corporation *354 and that The Clute Corporation did not receive in substantial part the consideration required to be paid by Baltimore Paint and Chemical Company, if such sale were otherwise proper. The details of any possible claim of The Clute Corporation arising out of the purported sale of The Synkoloid Company or the capital stock thereof have not been established as of the date of filing of the petition to which these financial statements are annexed, and the amount of such claim, if any, the persons against whom recoverable, and other material details with respect thereto remain to be determined. * * * (15) The Series A registered debenture notes matured on February 1, 1962, and have been in default as to both interest and principal since that date. The Series A registered debenture notes were issued in the aggregate principal amount of $500,000.00. Accrued and unpaid interest thereon aggregated approximately $42,292.00 as of October 15, 1962. The Series B registered debenture notes mature December 1, 1964, with interest at the rate of 7% per annum being payable semi-annually on June 1 and December 1 of each year. The Series B debentures are presently in default as to payment of interest, with *355 $15,312.50 in unpaid but accrued interest owing thereon as of October 15, 1962. The Series A debentures were issued together with stock purchase warrants permitting purchase of an aggregate of 20,000 shares of the common stock of The Clute Corporation at a price of $5.00 per share on or before February 1, 1962. The Series B registered debenture notes were issued in conjunction with stock purchase warrants permitting purchase of an aggregate of 10,000 shares of the common stock of The Clute Corporation at $11.00 per share at any time on or before December 1, 1962. All the Series A and Series B debenture notes were originally issued in denominations of $25,000.00 each. The present management of The Clute Corporation believes that the debenture notes are presently held by approximately 25-30 persons. Three debenture holders instituted legal actions to recover upon defaulted Series A debenture notes. (see Exhibit E, Sandoz v. The Clute Corporation, Lowell v. The Clute Corporation, and Cody v. The Clute Corporation.) Except for the subsequent actions of the trustee in bankruptcy, the Clute 82 Corporation itself had ceased doing business by November 5, 1962, the date of filing its Petition *356 for Reorganization; however, the various divisions and subsidiaries of the Clute Corporation, as described above, did not cease their operations in 1962 and were still carrying them on in 1963. On January 14, 1963, Ben H. Parker (holding a Doctor of Science degree in Geology) was appointed as trustee of the Estate of The Clute Corporation by the United States District Court in the District of Colorado. At the time of his appointment, Parker believed that there was a reasonable prospect of reorganizing the Clute Corporation. His principal activities as trustee in 1963 were those of collecting the corporation's physical assets and historical records, and attempting to search out and understand its rather complex activities and financial transactions occurring prior to the inception of the reorganization proceedings. Some of the information obtained by him led to the assertion of various claims and institution of lawsuits on behalf of the Clute Corporation against third parties. He actively sought to reorganize the Clute Corporation during 1963. On May 16, 1963, a claim, as later amended on June 19, 1963, was filed by the Internal Revenue Service in the reorganization proceeding against *357 the Clute Corporation for $139,197.94, such amount including excise taxes, interest and penalties. Such claim was disputed by the trustee and was not approved by the Referee in the reorganization proceeding. As of June 30, 1963, the book value of the corporation's assets, as reflected in certain accountant's worksheet records, exceeded the recorded liabilities by approximately one-million dollars. In the "Trustee's Report Of Operations For Period April 12, 1963, to June 30, 1963," the following information, in pertinent part, was provided: 1. The said Debtor now has no business operations which it is operating directly. 2. Active business operations in which the said debtor has an indirect or contingent interest are the operations of (a) The Ajax Iron Works Company (including operations under the trade name Truco Denver, Inc.), (b) Asbestos Bonding Corporation, and (c) Mineral Industrial Commodities of America, Inc.
3. The interests of said debtor in the active business operations mentioned in Paragraph 2 supra are represented by the ownership by said debtor of all or substantially all of the issued capital stock of The Ajax Iron Works Company and Asbestos Bonding Corporation and by *358 rights and interests of extent and character presently unknown in a fine grinding mill and operating rights thereto, presently controlled by Mineral Industrial Commodities of America, Inc. The right of possession of 19,244 shares of the capital stock of The Ajax Iron Works Company is in dispute and the debtor's right of ownership of all of the issued stock of Asbestos Bonding Corporation has been contested. 4. The operations of both The Ajax Iron Works Company and Asbestos Bonding Corporation since January 1, 1963 have not resulted in any net profit so as to permit the payments of any dividends on the capital stock of the respective companies from earnings during this period. * * * 7. The Trustee has been in regular touch with the managing officers of The Ajax Iron Works Company and has consulted with them at regular intervals concerning that company. The volume of orders obtained by The Ajax Iron Works Company since petition for reorganization of the debtor has decreased substantially. Investigation shows that this decrease results in large part from the fear held by many of its potential customers that the financial position of The Ajax Iron Works Company is so insecure as to make *359 the continuation of its operations and its ability to service its products highly questionable. 8. Invitations for sealed bids on all of the outstanding capital stock of The Ajax Iron Works Company were extended to ten prospective purchasers between April 19 and May 2. No bids for the outstanding capital stock were received but three companies to which invitations had been extended indicated possible interest in bidding on some or all of the assets of The Ajax Iron Works Company. As a result of this response, invitations to bid on assets were given to those companies which had shown interest in making such bids. During the period covered by this report one bid on assets had been received and another was expected to be delivered early in July. At the same time that the reorganization proceedings for the Clute Corporation were being carried on, the proceedings in the Denver District Court, involving inter alia, a property settlement between Harry and Rosamond, were also in progress. With regard to the property settlement issue, 83 Harry was required by the Denver District Court to submit an affidavit consisting of financial statement schedules of his assets and liabilities. In the schedule *360 of assets filed in November of 1963, the Clute Corporation 7 percent debenture bond, in the face amount of $25,000 was listed as having no value. The attorneys representing Rosamond, in light of their knowledge of the considerable litigation, both civil and criminal, and reorganization proceedings that the Clute Corporation was involved in, did not contest the listing of that corporation's bonds in Harry's schedule of assets as having no value. The Denver District Court, in its Findings of Fact, Conclusions of Law, Opinion, and Decree, issued on October 19, 1964, made a specific finding that the Clute Corporation bond had no value. Parker's services as trustee of the Estate of the Clute Corporation continued until September 22, 1967. During his term as trustee no plan of reorganization was filed although extensions of time within which to file such a plan were granted. Since on or before October 15, 1962, through Parker's term as trustee, ending on September 22, 1967, the Clute Corporation has been continuously in default on the payments of interest and principal on all of its outstanding debenture bonds. Up to the date of trial of these cases, the amounts realized and recovered on *361 the Clute Corporation assets, as listed in its financial statement dated October 15, 1962, were less than the listed outstanding liabilities of the corporation as of the same date. Of the total $2,523,874.32 in assets listed on the October 15, 1962 financial statement, approximately $1,880,000 was eventually written off as worthless. Of the $525,892.02 listed as "investments in and advances to Mica Division," approximately $480,000 was written off as worthless. The same fate fell upon approximately $1,086,000 of the $1,286,562.12 listed as "Investments in and advances to Asbestos Bonding Corporation." The record fails to disclose any information regarding any write-offs of the $352,910.67 listed as "Investments in and advances to Ajax Iron Works Company and Truco Division of Clute." In the 1962 Federal income tax return headed "Harry H. and Rosamond Goldberg," a $25,000 long-term capital loss was reported by virtue of the alleged worthlessness in that year of the 7-percent Clute Corporation debenture bond originally purchased by Harry on January 5, 1961. Although the full amount of $25,000 was reported as a long-term capital loss on the 1962 return, only $7,591.15 was actually taken *362 as a deduction in that year due to the limitations imposed by section 1211(b) Bour, 23 T.C. 237 (1954). deductions in any one year. Portions of the unused capital loss from the taxable year 1962, in the amount of $17,408.85, were subsequently claimed as deductions in the 1963, 1964, and 1965 Federal income tax returns filed by petitioner. In his notice of deficiency to petitioner with respect to the taxable years 1962, 1963, 1964 and 1965, respondent disallowed the capital loss deductions claimed by petitioner on the alleged worthlessness of the 7-percent Clute Corporation debenture bond in the taxable year 1962. In his explanation of adjustments, respondent stated that the deduction was disallowed "because you have failed to establish that such bond became worthless during the year [1962]." Ultimate Finding of Fact The 7-percent Clute Corporation debenture bond owned by petitioner became worthless in the taxable year 1962. Opinion The initial issue is whether the income tax return filed for the year 1962 in the names of "Harry H. and Rosamond Goldberg," but signed only by petitioner, was a joint return of both taxpayers for the year. Respondent has determined that this was petitioner's *363 separate return. Petitioner has the burden of proving the contrary. Rule 32, Tax Court Rules of Practice; sec. 7453. Citing such cases as Joseph Carroro, 29 B.T.A. 646 (1933) and Muriel Heim, 27 T.C. 270 (1956), affd. 251 F. 2d 44 (C.A. 8, 1958), petitioner contends that Rosamond should be presumed to have tacitly consented to the filing of the 1962 return as a joint return. Petitioner has misread these cases as they apply to the situation before us. A similar contention was made in Vincent S. Hennen, 35 T.C. 747 (1961), and rejected (at pages 748-9) as follows: This so-called tacit consent rule has been applied by us only in cases in which respondent was seeking to impose tax liability upon a spouse who had not signed the return, respondent having determined that there was consent to a joint return despite the missing signature. * * * 84 * * * Petitioner argues that a purported joint return without the wife's signature, coupled with her failure to object and to file a separate return, will be a presumptively valid joint return due to the tacit consent rule. * * * In every case in which it has been applied, respondent had made a determination that a joint return had been filed despite *364 the absence of one spouse's signature, and sometimes in the face of a direct refusal to sign. * * * The tacit consent presumption is nothing more or less than the presumption of correctness attaching to respondent's determination that a joint return was in fact intended. If no contrary evidence appears, his determination will be sustained, whether called a presumption of tacit consent or the regular presumption of correctness. We cannot agree that tacit consent can be applied where respondent has made a contrary determination, as here. * * * In this case there is a presumption against the tacit consent of Clarice, arising from the determination by respondent that no such consent to the filing of a joint return was given. Petitioner has offered no evidence to overcome such a presumption, and therefore cannot prevail. In that respondent has not made any determination that Rosamond consented to a joint return for the taxable year 1962, the "tacit consent" rule, as asserted by petitioner, has no application to the case before us. Vincent S. Hennen, supra. The fact that Rosamond failed to sign the return in question is not necessarily fatal to a finding that it should be treated as a *365 joint return. Muriel Heim, supra.The ultimate determination is whether the spouses mutually intended to file and claim the benefits of a joint return, their signatures being an important indication of such intent. Hyman B. Stone, 22 T.C. 893 (1954), appeal dismissed; Elsie S. Bour 23 T.C. 237 (1954). The matter of mutual intent is a question of fact to be determined from all of the evidence surrounding the filing of the return. Alma Helfrich, 25 T.C. 404 (1955); Sharwell v. Commissioner, 419 F. 2d 1057 (C.A. 6, 1969), affirming a Memorandum Opinion of this Court on this issue. Among other things, this intent may be inferred from the acquiescence of the nonsigning spouse. Victor S. Hennen, supra. Upon a thorough review of all the evidence surrounding the filing of the return in question, we have concluded that petitioner has failed to carry his burden of proving that both he and Rosamond intended such return to be filed as a joint return. The evidence indicates that Rosamond did not have any knowledge of the filing of the return and could not therefore have intended it to be filed as a joint return. Even if Rosamond did have knowledge of the return, it is not likely that at the time *366 it was being prepared and filed she would have been willing to cooperate with petitioner and file a joint return with him. On April 29, 1962, petitioner and Rosamond separated. Rosamond believed at that time that petitioner was involved in an extramarital affair with another woman. On October 16, 1962, she filed a complaint for divorce in the Denver District Court against petitioner which was later amended to seek a decree of separate maintenance, wherein she alleged, inter alia, that petitioner had been guilty of extreme mental cruelty and notorious violation of his marriage vows to her. The accountant who prepared the tax return in question testified that he purposely did not ask Rosamond to sign the return because he felt she would refuse to do so. He wanted to avoid any violent outbursts on her part which he thought would be brought on by his asking her to sign the return. Neither did petitioner request Rosamond to sign the return. He, presumably, also knew that Rosamond was not of a mind to cooperate with him in any way. Upon the record before us we conclude and hold that Rosamond did not intend the 1962 return, as filed without her signature or her knowledge, as a joint return *367 by her and petitioner. Petitioner has failed to establish that she intended to file a joint tax return with him. Accordingly, respondent's determination that the return in question was filed as petitioner's separate return is sustained. The second issue presented for our decision is whether certain legal fees paid by petitioner primarily in connection with the negotiations and court proceedings surrounding a property division and alimony settlement with his wife were deductible for the taxable year 1964 under section 212(2). [2] 85 We have found as a fact that the time spent by all the attorneys representing petitioner and Rosamond was devoted primarily to the property division between Harry and Rosamond. The property settlement dispute had its origin in the complaint for divorce filed by Rosamond in the Denver District Court wherein she sought, inter alia, a decree allowing her *368 one-half of the property of which petitioner was possessed. The divorce complaint was subsequently amended to pray for separate maintenance, but the plea for the above-described property settlement was continued. Included in the assets owned by petitioner was the capital stock of Colorado Metal Products Company, a subchapter S corporation. A substantial amount of petitioner's income was derived from his salary and dividend income from this corporation. He was therefore especially interested in preventing Rosamond from obtaining a one-half ownership and management interest in this company. Petitioner contends, essentially, that since most of the attorney fees are attributable to legal services involving the settlement of his property rights, which included a substantial income-producing asset, that such fees are deductible under section 212 (2) as an ordinary and necessary expense paid for the conservation or maintenance of property held for the production of income. The validity of this contention has been thoroughly considered by this and other courts, and in 1963 it received a mortal blow from the United States Supreme Court in United States v. Gilmore, 372 U.S. 39 (1963). The Gilmore *369 case involved the issue of whether under the predecessor of section 212(2), section 23(a)(2), the fees paid by a taxpayer in a divorce suit to defend against a claim by the other spouse to his income-producing property were deductible for income tax purposes. The Supreme Court made the following disposition, in pertinent part, of this issue: The principle we derive from these cases is that the characterization, as "business" or "personal," of the litigation costs of resisting a claim depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities. It does not depend on the consequences that might result to a taxpayer's income-producing property from a failure to defeat the claim * * * For these reasons, we resolve the conflict among the lower courts on the question before us * * * in favor of the view that the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was "business" or "personal" and hence whether it is deductible or not under § 23(a)(2). We find the reasoning underlying the cases *370 taking the "consequences" view unpersuasive. * * * Indeed most of the cases * * * have tended to confine the deduction to situations where the wife's alimony claims, if successful, might have completely destroyed the husband's capacity to earn a living. Such may be the situation where loss of control of a particular corporation is threatened, in contrast to instances where the impact of a wife's support claims is only upon diversified holdings of income-producing securities. But that rationale too is unsatisfactory. For the diversified security holdings are no less "property held for the production of income" than a large block of stock in a single company. And as was pointed out in Lykes, supra, 343 U.S. at 126, 72 S. Ct. at 589, 590, 96 L. Ed. 791, if the relative impact of a claim on the income-producing resources of a taxpayer were to determine deductibility, substantial "uncertainty and inequity would inhere in the rule." * * * In classifying respondent's legal expenses the court below did not distinguish between those relating to the claims of the wife with respect to the existence of community property and those involving the division of any such property. * * * Nor is such *371 a break-down necessary for a disposition of the present case. It is enough to say that in both aspects the wife's claims stemmed entirely from the marital relationship, and not, under any tenable view of things, from income-producing activity. * * * In United States v. Patrick, 372 U.S. 53 (1963), a companion case to and decided on the same day as Gilmore, the Supreme Court disallowed a substantially similar claim for deduction under section 212(2), holding that the governing principles of Gilmore were equally applicable therein. Petitioner feebly attempts to distinguish this case from the Gilmore and Patrick 86 cases, asserting that those cases only apply where the legal fees arise out of a divorce suit. In our case, the legal fees were substantially attributable to the property settlement controversy originating from a complaint, as amended, for separate maintenance made by petitioner's ex-wife, Rosamond. The fact that separate maintenance was initially granted by the Denver District Court without making a final ruling on the property settlement question does not in any way negate the fact that this question did arise from and was still part of the suit originated by the complaint *372 for separate maintenance. In fact, in the June 24, 1963 decree, granting separate maintenance to Rosamond, the Denver District Court further ordered that a hearing be set for September 24, 1963, with regard, inter alia, to the division of property. Even a narrow reading of the Gilmore and Patrick cases would not confine their application to legal fees arising from a divorce case. The essence of both these cases is that legal fees incurred in defending against claims which arose from the taxpayer's marital relationship, regardless of the possible consequences on the taxpayer's income-producing property, are not deductible as ordinary and necessary expenses for the conservation or maintenance of such property. The claim by Rosamond for one-half of the petitioner's assets was included in her complaint for separate maintenance against petitioner. Petitioner cannot seriously contend that such claim had an origin other than that of his marital relationship with Rosamond. The claim did not arise in connection with petitioner's profit-seeking activities. Accordingly, the legal fees paid by him, attributable to such claim, cannot be held to be deductible under section 212(2). Petitioner contends *373 that Samuel Galewitz, 50 T.C. 104 (1968), is controlling in our disposition of the attorney fees issue. The facts of Galewitz bear little, if any, resemblance to those of the case before us and we regard it as clearly distinguishable. Also subsequent to the filing of petitioner's brief herein Galewitz was reversed by the Second Circuit, 411 F. 2d 1374 (C.A. 2, 1969) and certiorari was denied, 396 U.S. 906 (1969). In light of the marked similarity of the Gilmore and Patrick cases to the one before us, we do not regard our opinion in Samuel Galewitz as persuasive authority in our disposition of this issue, and respondent's determination is sustained. The final issue presented for our decision is whether the 7 percent debenture bond purchased in 1961 by petitioner in the Clute Corporation became wholly worthless in 1962 so as to entitle him to claim a capital loss for the year under section 165(g). Section 165(g) provides in part as follows: SEC. 165. LOSSES (g) Worthless Securities. - (1) General Rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale *374 or exchange, on the last day of the taxable year, of a capital asset. (2) Security Defined. - For purposes of this subsection, the term "security" means * * * (C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form. To fall within the above-quoted provisions of section 165(g) for the taxable year 1962, petitioner must prove that the debenture bond became "wholly worthless" during such year. Section 1.165-5(c), Income Tax Regs.
To prove that a "security," such as the bond here involved, became wholly worthless during a taxable year, petitioner must show that it ceased to have both liquidating value, an excess of the underlying corporate assets over liabilities, and potential value, a reasonable expectation that such assets would exceed the liabilities in the future. Sterling Morton, 38 B.T.A. 1270 (1938), affd. 112 F. 2d 320 (C.A. 7, 1940); Charles W. Steadman 50 T.C. 369 (1968), on appeal (C.A. 6, Jan. 3, 1969). In the Morton case, wherein the question of the worthlessness of stock was involved, the Court (at page 1278) said: [Stock] may *375 not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, [but] * * * such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs 87 of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock. Whether a security, such as the debenture bond here involved, did become worthless during a given taxable year is purely a question of fact. Boehm v. Commissioner, 326 U.S. 287 (1945). Upon a thorough review of all the facts of record, we have concluded that the debenture bond in question ceased to have both liquidating and potential value during the taxable year 1962, thus being rendered wholly worthless during such year. In light of the complete inadequacy of the *376 capitalization of Clute, its desperate financial situation towards the end of the year and the occurrence in that year of such "identifiable events" as the filing of a Petition for Reorganization pursuant to Chapter X of the Bankruptcy Act, and its cessation of business operations, we conclude that after that year there was no reasonable prospect of future profits and we find that petitioner acted as a prudent businessman in ascertaining worthlessness of the defaulted bond and claiming his loss in 1962. Charles W. Steadman, supra. Respondent would have us rely on the financial statement attached to the Petition for Reorganization which showed the book value (as contrasted with fair market value) of the corporation's assets exceeding its liabilities by approximately $1,125,000. This statement is obviously unreliable as an indication of the bond's liquidating and potential value in 1962. Note 1 to this financial statement called attention to the fact that all of the information therein was presented only insofar as known to the present management personnel, which had only been actively engaged as such since approximately July 10, 1962. The note further explained that because of the *377 lack of time and unavailability of certain corporate records, that no attempt had been made to audit or independently verify any of the information, and that none of the amounts stated as the value of the assets purported to represent realizable values. The corporation had only $5,500 in cash on hand as of October 15, 1962 and of assets having book value of over $2,500,000, over $2,000,000 consisted of investments in and loans to its subsidiary companies, all of which were also in precarious financial condition. Even with the limited information and time available to the newly appointed management, it was still able, in further notes to the financial statement, to cast serious doubt on the collectibility and realization of most of the assets listed in the statement. The actual realization of the assets in subsequent years pointed out the wisdom of the management's notes to the financial statement cautioning the Federal District Court that the stated book value of the assets did not purport to represent realizable values; of the total $2,523,874.32 in assets listed on the financial statement submitted with the Petition for Reorganization, approximately $1,880,000 was eventually written *378 off as worthless. In contending that the bond still had potential value in 1962, respondent points out that the trustee of the Estate of the Clute Corporation, was under the belief, upon his appointment in early 1963, that there was a reasonable prospect of reorganizing the corporation. We are unable to infer, as does respondent, that a single optimistic report of the future of the Clute Corporation, conditioned upon a reorganization, which as of the date of trial was still yet to come about, is indicative of potential value. Charles W. Steadman, supra.Upon the facts present at the close of 1962, we feel that petitioner has carried his burden of proving that he acted correctly and as a prudent businessman in abandoning any hope to recover his $25,000 in the Clute Corporation bond. In imposing upon a taxpayer the difficult task of determining the year of worthlessness, the taxing statute does not require him to be an incorrigible optimist. United States v. S.S. White Dental Co., 274 U.S. 398 (1927). Accordingly, we hold that petitioner has sustained his burden of proving that the Clute Corporation debenture bond became wholly worthless during 1962 and that he was therefore entitled *379 to claim a capital loss of $25,000 for such year under section 165(g). Decision will be entered under Rule 50. 88 Footnotes
1. All section references are to the Internal Revenue Code of 1954, unless otherwise designated.↩
*. The corporation retained a 15% working interest in properties which it received for management services in the fiscal year 1960. Such interest was then valued at $150,000.00 by management personnel.↩
2. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - * * * (2) for the management, conservation, or maintenance of property held for the production of income; or * * *↩